UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

IN RE CIPROFLOXIN HYDROCHLORIDE
ANTITRUST LITIGATION

**MEMORANDUM AND ORDER**
Case No. 00-MDL-1383 (FB)

------------------------------------------------------------x

**BLOCK, Senior District Judge:**

Defendants' motions for summary judgment in this antitrust action were granted and affirmed on appeal. Plaintiffs now move this court to vacate the award of $127,558.55 in costs imposed by the Clerk of the Court pursuant to Federal Rule of Civil Procedure 54(d)(1). For the reasons that follow, that motion is granted.

**I**

Defendant Bayer AG and its subsidiary, Bayer Corporation (collectively "Bayer"), possess the patent for the active ingredient in the antibiotic ciprofloxacin hydrochloride ("Cipro"). The patent was issued in June 1987 and scheduled to expire in December 2003, with an additional six-month period of pediatric exclusivity until June 2004.

In 1991, defendant Barr Laboratories, Inc. ("Barr") filed an Abbreviated New Drug Application ("ANDA") seeking approval to market a generic version of

Cipro. Barr included a pre-expiration challenge ("ANDA-IV" certification), through which it sought permission to market the generic drug before Bayer's patent expired on the grounds that the patent was invalid or would not be infringed. *See* 21 U.S.C. § 355(j)(2)(B). An ANDA-IV certification is an act of infringement, *see* 35 U.S.C. § 271(e)(2)(A); *Arkansas Carpenters Health and Welfare Fund v. Bayer AG*, 604 F.3d 98, 101 (2d Cir. 2010), and Bayer responded by suing Barr for patent infringement in January 1992 in the Southern District of New York. To fund the litigation, Barr entered into an agreement with defendant The Rugby Group ("Rugby"), then a subsidiary of defendant Hoechst Marion Roussel, Inc. ("HMR"),[1] under which Barr agreed to share its potential profits from the generic drug with Rugby in exchange for Rugby's agreement to finance a portion of the litigation.

In January 1997, Bayer and Barr settled the patent litigation by agreeing to what is known as a "reverse exclusionary payment" – Bayer, the patent holder, payed Barr, the alleged infringer, to stay off the market and end the litigation. Bayer agreed to pay Barr $49.1 million upfront, plus either quarterly payments of $12.5 million to $17.125 million until six months prior to the patent's expiration or a license to sell Bayer-manufactured Cipro, and it gave the generic manufactures permission to sell Cipro at a reduced rate for six months before the patent's expiration.

As a result of this settlement, purchasers of Cipro filed over 30 antitrust actions in 2000, which were consolidated in the Eastern District of New York before

---

[1]Rugby was subsequently sold to defendant Watson Pharmaceuticals, Inc. ("Watson") (collectively, with Barr and HMR, "generic defendants").

Judge David Trager.  In 2005, the court granted defendants' summary judgment motions and held that because the agreements did not restrain competition beyond the scope of the patent they had no anti-competitive effect.  *See In re Ciprofloxcin Hydrochloride Antitrust Litigation*, 363 F. Supp. 2d 514 (E.D.N.Y. 2005) ("*Cipro I*").  Plaintiffs appealed.

The Second Circuit retained jurisdiction over the direct purchaser plaintiffs' appeals, but transferred the indirect purchaser plaintiffs' appeal, which included claims arising out of patent law, to the Federal Circuit.  The Federal Circuit affirmed, holding that the district court applied an appropriate level of antitrust scrutiny "because any anti-competitive effects . . . were within the exclusionary zone of the patent" and that the state antitrust claims were properly dismissed.  *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 544 F.3d 1323, 1341 (2008) ("*Cipro II*").  The Second Circuit also affirmed, emphasizing that it was bound by its decision in *Joblove v. Barr Labs. Inc., (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F..3d 187 (2d Cir. 2006) ("*Tamoxifen*").  *See Arkansas Carpenters Health and Welfare Fund v. Bayer AG*, 604 F.3d 98 (2010) ("*Cipro III*").

Defendants filed their requests for bills of costs on December 1, 2010.  Plaintiffs filed no objections.  On May 13, 2011, Magistrate Judge Steven Gold directed the clerk to tax costs in the full amount sought.  On May 18, 2011, the Clerk taxed plaintiffs $53,066.80 in favor of Bayer; $36,952.75 in favor of Barr; and  $37,539.00 in favor of HMR, Rugby, and Watson.  On May 20, 2011, plaintiffs filed the motion to vacate costs now before the Court.

3

II

a. Timeliness.

Federal Rule of Civil Procedure 54(d)(1) provides that, after a clerk taxes costs, a district court may review the clerk's action "[o]n motion served within the next 7 days." Plaintiffs complied with this rule, as their motion was filed within seven days of the Clerk's entry. Local Rule 54.1(b), however, imposes an additional procedural requirement: "A party objecting to any cost item shall serve objections . . . prior to or at the date and time scheduled for taxation." If no objections are filed, "any item listed may be taxed within the discretion of the Clerk." Local Rule 54.1(b).

Plaintiffs' failure to object prior to entry of costs thus constitutes a default under the local rules. *See Dejesus v. Starr Technical Risks Agency, Inc.*, No. 03 Civ. 1298, 2005 WL 957389 at *1 (S.D.N.Y. 2005) ("Court finds that plaintiff defaulted under Local Rule 54.1 by not objecting to the bill of costs prior to [date of hearing]."); *Weisbart v. U.S. Dept. of Taxation*, No. 97 Civ. 6020, 2001 WL 1782873 at *4 (E.D.N.Y. 2001) (declining to consider the merits of an objection to the Clerk's award of costs where the losing party failed to comply with Local Rule 54.1(b)). Plaintiffs' explanation for missing the deadline is that their counsel contacted the Clerk's office to inquire when objections were due and was told, inaccurately, that a hearing date would be set and they had until the hearing date to file objections.

The Court "has broad discretion to determine whether to overlook a party's failure to comply with local rules." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 109 n.2 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir.

4

2001)). Where equity so requires, the Court will exercise its "'inherent power' to review an award of costs, even if no objections were made to the Clerk before costs were awarded." *See Weisbart v. U.S. Dept. of Taxation*, No. 97 Civ. 6020, 2001 WL 1782873 at *4 (E.D.N.Y. 2001). Here, equity favors review of plaintiffs' motion on the merits.

**b. Award of costs.**

Under Rule 54(d)(1), "[u]nless a federal statute, [the Federal Rules of Civil Procedure], or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party." There is a strong presumption that the prevailing party will be awarded costs under Rule 54(d) – "an award against the losing party is the normal rule obtaining in civil litigation, not an exception." *See Whitfield v. Scully*, 241 F.3d 264, 270 (2d Cir. 2001). It is within the district court's discretion to deny costs for a variety of reasons, including "misconduct by the prevailing party, the public importance of the case, the difficulty of the issues, or the losing party's limited financial resources." *Id.* at 270; *see also McDonnell v. American Leduc Petroleums, Limited*, 456 F.2d 1170, 1188 (2d Cir. 1972); *see also Ramnarain v. City of New York*, 474 F.Supp. 2d 443, 448 (E.D.N.Y. 2007).[2] The losing party shoulders the burden of rebutting the presumption against it and, should a district court decide to deny costs, it "must articulate its reasons." *See Whitfield*, 241 F.3d at 270.

---

[2]There is no statute or rule that supercedes a district court's Rule 54(d)(1) discretion to award or deny costs to a plaintiff who has failed to prevail in an antitrust action. *See White & White, Inc. v. American Hosp. Supply Corp.*, 786 F.2d 728, 731 (6th Cir. 1986). The Clayton Act provides that a party injured by an antitrust violation "shall recover . . . the cost of suit." 15 U.S.C. § 15(a). It does not alter a court's discretion to award or deny costs to a plaintiff who has failed to prove a violation.

Plaintiffs argue that the Court should deny defendants costs here because the litigation was "close, complex and protracted." These are valid reasons to deny defendants costs. *See Remington Products, Inc. v. North American Philips, Corp.*, 763 F. Supp. 683, 687 (D. Conn. 1991); *see also Rivera v. City of Chicago*, 469 F.3d 631, 635 (7th Cir. 2006) ("the district court should consider the amount of costs, the good faith of the losing party, and the closeness and difficulty of the issues raised by a case"); *Whitfield*, 241 F.3d at 270 (costs may be denied because of "difficulty of the issues"); *White & White, Inc. v. American Hosp. Supply Corp.*, 786 F.2d 728, 732 (6th Cir. 1986) (affirming denial of costs in "close and difficult" case). "The closeness of a case is judged not by whether one party clearly prevails over another, but by the refinement of perception required to recognize, sift through and organize relevant evidence, and by the difficulty of discerning the law of the case." *White & White, Inc.*, 786 F.2d at 732.

The law regarding reverse exclusionary payments was in flux throughout the course of this litigation. At the time plaintiffs' complaint was filed, no circuit court had ruled on the legality of reverse exclusion payment agreements and the Federal Trade Commission viewed such settlements as violations of antitrust law. *See Cipro II*, 604 F.3d at 104-105. As of 2003, when Judge Trager denied defendants' motions to dismiss, the Second Circuit had not yet decided the question and "courts within other circuits [had] found that agreements between pioneer drug manufacturers and generic manufacturers that filed ANDA IVs seeking to market a generic version of the pioneer drug constitute horizontal market allocations agreements and are, thus, *per se* illegal." *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 261 F. Supp. 2d 188, 237 (E.D.N.Y.

6

2003). Judge Trager distinguished these cases and determined that the agreements at issue here were not *per se* illegal. *Id.* at 257. This triggered two years of discovery prior to the court's 78-page opinion, in 2005, granting defendants summary judgment.

The Second Circuit panel noted that it was bound by *Tamoxifen*, which was decided while this case was pending on appeal. *Cipro II*, 604 F.3d at 105. It pointed to several reasons, however, why en banc reconsideration of the issue would be appropriate. *Id.* at 108-110. Although the Circuit ultimately denied rehearing en banc, Judge Pooler penned a vigorous dissent. *See Arkansas Carpenters Health and Welfare Fund*, 625 F.3d 779 (2d Cir. 2010). The Federal Circuit also relied heavily on *Tamoxifen*, as well as recent Eleventh Circuit case law. *See Cipro III*, 544 F.3d at 1335-1336.

In short, the law of this case has been difficult to discern, as evidenced by the depth and length of the Judge Trager's analysis, the conflicting circuit court approaches and the development of the issue over the long life of the case. Moreover, there is no suggestion that plaintiffs brought this action in bad faith. Accordingly, the Court finds that this litigation was sufficiently close, complex and protracted to warrant the parties bearing their own costs.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
January 30, 2012